[No. G027063. Fourth Dist., Div. Three. Oct. 11, 2000.]

In re DeJOHN B. et al., Persons Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
JOHNELL P. et al., Defendants and Appellants.

**COUNSEL**

Sandra L. Thomas, under appointment by the Court of Appeal, for Defendant and Appellant Johnell P.

Marsha Faith Levine, under appointment by the Court of Appeal, for Defendant and Appellant Adolph B.

Laurence M. Watson, County Counsel, and Ward Brady, Deputy County Counsel, for Plaintiff and Respondent.

Melissa A. Chaitin, under appointment by the Court of Appeal, for Minors.

## Opinion

**RYLAARSDAM, J.**—Johnell P. (mother) and Adolph B. (father), parents of now three-year-old twin sons, DeJohn and Edward B., appeal from a judgment under Welfare and Institutions Code section 366.26 selecting adoption as the minors' permanent plan and terminating the parents' rights. (All further statutory references are to the Welfare and Institutions Code; the § 366.26 hearing is designated the permanency hearing.) Mother contends the judgment must be reversed because she was deprived of a fair hearing when Orange County Social Services Agency (SSA) did not even attempt to notify her of the six-month review hearing where the court terminated reunification services and scheduled a permanency hearing. She is right. Father has no independent challenge, but argues his parental rights must be reinstated if mother prevails. He also is right.

We reverse the judgment and remand for proceedings comporting with due process. We publish our decision because the failure to give notice carries such grave consequences in the dependency court, where parent-child ties may be severed forever. Social services agencies, invested with a public trust and acting as temporary custodians of dependent minors, are bound by law to make every reasonable effort in attempting to inform parents of all hearings. They must leave no stone unturned. Where, as here, the agency has not even attempted to advise a parent of proceedings that affect her fundamental rights as a parent, we will not accept an argument that SSA's failure to give notice was harmless. We reject the contention that we can ignore the lack of notice because the parent was unworthy and, thus, was not prejudiced by lack of notice. We also reject the assertion that the minors' interest in stability trumps the parent's constitutional rights.

As we stated in *In re Anna M.* (1997) 54 Cal.App.4th 463 [62 Cal.Rptr.2d 831], "[T]he dependency system as a whole [is] ill-served by . . . defective procedures." (*Id.* at p. 467.) We cannot and will not endorse SSA's failure to notify mother of the proceedings and its subsequent cynical effort to justify its conduct as ultimately serving the best interests of the minors. The court erred in disregarding a fatal flaw in the proceedings.

Unfortunately, the violation of mother's right to notice was not rectified on the spot. This converted a relatively short delay into one of many months. SSA, rather than immediately conceding the point, has relentlessly pursued the defense of an indefensible position. We greatly regret the disruption in the minors' lives, a hardship surely magnified by the passage of time required for this appeal. But justice is not served by sacrificing a parent's due process rights to a minor's need for stability. Loath as we are to undo the permanency plan, it must be done.

FACTS

DeJohn and Edward were taken into protective custody on November 5, 1998, because no one had picked them up from their daycare facility. The night before, father had exhausted his allotted time to stay at an Orange County shelter. His and mother's whereabouts were unknown, and SSA had no information concerning mother's "ability [or] desire . . . to provide for the minors." SSA had little information about mother's identity. After conducting a computer search which yielded a name and last known address in Long Beach, the agency sent a telegram there containing information about the detention hearing. SSA additionally mailed a copy of the petition and a notice of the hearing to the same address. It also sent a telegram to the shelter where father had most recently resided.

On December 8, the social worker assigned to the "absent parent search unit" filed declarations explicating her attempts to locate and notify the parents of the pretrial default hearing. Father, who has an extensive drug-related criminal history, was found in jail. The search for mother was unsuccessful. SSA's "records did not list [her] full name, date of birth, social security number, physical description, driver's license number, indication of ethnic identity, or any names, addresses, or phone numbers of family or friends . . . which would enhance the likelihood of obtaining her current address." The social worker had learned from various governmental agencies that mother, at one time, had received food stamps at the Long Beach address. She had sent a certified letter there, return receipt requested, with a copy of the petition and notice of the date, time, place and purpose of the pretrial default hearing. She had also uncovered two addresses in Bellflower and sent certified letters with the same notice to both of them. Having received no response, she attested she had at that time "exhausted all possible leads."

SSA's report for the pretrial default hearing noted that mother's where-abouts remained unknown. Father had told the social worker that mother had abandoned the twins six or eight months earlier, and that he had been caring for them ever since. Mother had talked to him only twice during that time. He thought she might be "on the streets." There is no indication the social worker asked father to direct her to mother's relatives, close friends or others who might know her whereabouts.

SSA outlined father's services, adding that a case plan for mother would be developed "[o]nce [she] has established contact with [SSA] and expressed her desire to accept services." Mother's default was taken under submission, and trial of the jurisdictional and dispositional issues was scheduled for December 22.

There is no declaration regarding SSA's efforts, if any, to provide mother with notice of the jurisdictional-dispositional hearing or its continued dates. The reporter's transcript of the hearing, which eventually went forward in February 1999, discloses no inquiry by the court on this subject. Mother's default was entered, and, pursuant to the written stipulation of SSA, father, and the minors, the court found the allegations of the amended petition true and vested the twins' custody with SSA. Father was advised that his parental rights were in jeopardy should he be unable to reunify with the minors within six months.

For the remainder of the children's dependency, father was in and out of jail. He made no satisfactory progress on his service plan.

No attempt was made to notify mother of the six-month review hearing scheduled for September. At this crucial hearing, SSA's and minor's counsel stipulated that return of the minors to their parents would create a substantial risk of detriment to them, continued supervision was necessary, reasonable services had been provided to the father, the parents had failed to participate in the court-ordered treatment plan, the minors were under the age of three when removed from parental custody, reunification services should be terminated and the case referred for a permanency hearing. Over father's objection, the court made findings and orders consistent with these stipulations and scheduled the permanency hearing for late December. The court sent mother a notice of the need to petition for extraordinary relief at the Long Beach address.

One month after the six-month review hearing, SSA located the children's maternal grandmother and, through her, obtained mother's address in Las Vegas. SSA then sent mother notice of the permanency hearing. The circumstances surrounding SSA's belated discovery of the grandmother are not explained in the record. Nor is there any indication why she could not have been identified earlier. The agency was satisfied with a cryptic explanation: "[M]other's whereabouts were unknown until recently." (At a subsequent hearing, SSA's counsel gave the court an equally weak and uninformative excuse, stating, "The Compton address that we did come up with, there was new information that the social worker located through the computer. That's when the Compton address came up.")

Mother signed a receipt for the notice on October 20. SSA acknowledged that upon learning of the dependency, she "made regular contacts with the assigned social worker and requested visitation with the children." In mother-to-social-worker calls in November, mother told her side of the story, saying she had left the twins in the care of her brother while she

looked for a job. The next day, father had taken them. Mother's inquiries to friends and relatives yielded no information about the minors' whereabouts. She was told the police could not help her because there was no formal custody order. In late August, she talked to father, who said the twins were in custody but would not tell her where. Her search with the department of social services for Los Angeles County, where the parties had been living when father took the minors, was fruitless. On the witness stand, father confirmed mother's account, testifying he kept the children's location a secret from her.

Notwithstanding the recent developments, SSA continued to recommend parental rights be terminated and the minors be freed for adoption. It reported the twins were doing "very well" and were bonded with foster parents who had been their caretakers for about nine months and wanted to adopt them.

Mother appeared on the date scheduled for the permanency hearing. The court appointed counsel for her and granted a request for a continuance to February 3, 2000. Counsel sought a visitation order, advising the court SSA had rejected mother's requests to see the children. SSA opposed visitation and the court denied mother's request, finding nothing new that would change the "previous order."

On April 3, the court conducted the permanency hearing. At the same time the court heard mother's motion, based on lack of the statutorily required notice (§ 366.21, subd. (b)), to set aside all findings made at and subsequent to the six-month review; the court also heard her petition for modification (§ 388). Mother's declaration attested to the facts we recited earlier, regarding her separation from the minors. The court also considered an addendum to SSA's report, which indicated that mother had provided "a letter from her employer, a copy of her pay stub, a rental agreement, and a letter expressing her desire to have the custody of her children." Mother asked the court to end the dependency and return the twins outright, return them under a family maintenance plan, or offer a service plan.

The court first entertained argument on mother's motion to set aside prior findings and orders. SSA asserted "there is no such thing as a motion to set aside" in dependency court. It also contended it had no duty to undertake "a formal in-depth search at the six-month review." It claimed the dependency notice requirements are directory, not mandatory. It argued even if notice had been properly given, "the result would have been exactly the same. The court would have terminated [mother's] reunification services [at the six-month review hearing] and set a two-six [permanency] hearing."

The court observed it "[could not] and should not stand by and permit violations of notice requirements, things of that nature to take place." It also

took exception to minors' counsel's position that parents who "do[n't] notice that their children are gone . . . don't deserve notice." Nevertheless, it denied the motion to set aside, reasoning strict compliance with statutory notice was not necessarily required, and mother had failed to prove notice of the six-month review hearing would have made a difference in the outcome.

Turning to the section 388 petition, the court found mother had shown a change of circumstances, but it was unimpressed with her efforts to find her children. It stated, "She never did the obvious that any person who watched any TV show would do. She never filed a missing person's report. She never went and sat down and said, 'I can't find my children.' Duh. [¶] And therein lies the lack of credibility for the mother when she says she searched." Denying the motion, the court found a "failure of proof" on mother's part because, under the best interests test, the minors were in a stable placement and would be "devastated by a change and the consequence of the foolish things that mom and dad have done . . . ." Making all appropriate findings, it terminated parental rights and freed the minors for adoption.

DISCUSSION

*Mother's Appeal*

We begin with principles that are well established but bear repeating. ▮ Parents have a fundamental and compelling interest in the companionship, care, custody, and management of their children. (*Stanley v. Illinois* (1972) 405 U.S. 645, 651 [92 S.Ct. 1208, 1212-1213, 31 L.Ed.2d 551].) "[T]he state also has an urgent interest in child welfare and shares the parent's interest in an accurate and just decision. [Citation.]" (*David B. v. Superior Court* (1994) 21 Cal.App.4th 1010, 1018 [26 Cal.Rptr.2d 586].) To ensure that result, "[u]ntil parental rights have been terminated, both parents must be given notice at each step of the proceedings. [Citation.]" (*Id.* at p. 1019.) The notice must comport with due process. (*In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1418 [286 Cal.Rptr. 239].) "[D]ue process requires 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' [Citation.]" (*Ibid.*)

▮ SSA's duty to give notice of status review hearings is specified by statute. With certain exceptions not pertinent here, section 366.21, subdivision (b) provides, "[N]otice of the hearing shall be mailed by the social worker . . . to the child's parent . . . by first-class mail addressed to the last known address of the person to be notified . . . not earlier than 30 days nor later than 15 days preceding the date to which the hearing was continued.

Service of a copy of the notice personally or by certified mail return receipt requested, or any other form of actual notice is equivalent to service by first-class mail. [¶] The notice shall contain a statement regarding the nature of the hearing to be held and any change in the custody or status of the child being recommended by the supervising agency."

The law is clear enough. But SSA ignored the law. It failed to attempt to notify mother of the six-month review hearing, at which reunification services were terminated and the case referred to the permanency hearing. Compounding the injury, when the matter was brought to light, rather than stipulating to a remedy according with due process and thereby avoiding the delay of appeal and inevitable reversal (see, e.g., *In re Rashad H.* (2000) 78 Cal.App.4th 376, 380-381 [92 Cal.Rptr.2d 723]), SSA doggedly asserted its unjustifiable position. Now, on appeal, it "trivializes [the notice issue] by ignoring [its] constitutional implications," (*In re Anna M., supra,* 54 Cal.App.4th at p. 468) and urging us to follow suit. We decline the invitation.

*In re Melinda J., supra,* 234 Cal.App.3d 1413 provides an instructive foundation for our analysis. There, the "single mother who supported her heroin addiction by engaging in prostitution and illegal drug sales . . . . left [the minor] with a casual acquaintance and never returned." (*Id.* at p. 1415.) Filing a dependency petition, SSA "sent a certified letter to [mother's] last known address, contacted the post office to determine a forwarding address, and mailed a letter to the grandparents asking for help in locating [mother.]" (*Id.* at p. 1416.) It undertook a comprehensive search, uncovering "several more addresses, to which [it] sent additional certified letters with copies of the petition." (*Ibid.*) When the mother failed to appear at the jurisdictional-dispositional hearing, her default was entered. A few days later, she was jailed, and for four months, the social worker visited her, counseled her and provided her with referrals to be utilized upon her release. The efforts were to no avail. Released before the six-month review hearing, the mother disappeared again. SSA repeated its efforts to notify her of the hearing; she did not appear. SSA conducted another absent parent search and sent certified letters regarding the 12-month review hearing to all addresses. The mother failed to respond or appear. She finally signed an acknowledgment of receipt of notice of the permanency hearing at which her parental rights were terminated. (*Id.* at pp. 1416-1417.)

The *Melinda J.* court rejected the mother's due process notice challenge. It stated, "SSA made sincere and extensive efforts to locate [the mother]; even with the benefit of hindsight, we see nothing else that should have been done. '[I]t has been recognized that, in the case of persons missing or

unknown, employment of an indirect and even a probably futile means of notification is all that the situation permits and creates no constitutional bar to a final decree foreclosing their rights.' [Citation.]" (*In re Melinda J., supra,* 234 Cal.App.3d at p. 1419.) In response to the mother's contention the judgment should be reversed because two hearing notices were mailed with a shorter lead time than required under the statute, i.e., respectively nine days and seven days prior to the hearings, rather than within the prescribed 15- to 30-day advance period (§ 366.21, subd. (b)), the court found "[r]eversal based solely on the SSA's noncompliance with the time periods would place ' "undue weight on a matter of procedure rather than substance.' " [Citation.]" (234 Cal.App.3d at p. 1419.) It added that, in any event, the mother did "not suggest that timely mailing to her last known address would have secured her presence at the hearings." (*Ibid.*) Thus, the agency's "lack of strict compliance with [the statutory time frames for notice], in the absence of prejudice, [did] not render the subsequent proceedings void. [Citation.]" (*Ibid.*)

SSA primarily relies upon *Melinda J.*'s language, taken out of context, to support its position. The case contradicts, rather than bolsters, SSA's assertion it did not need to give *any* notice of the six-month review hearing when mother failed to respond to notice of prior hearings. The *Melinda J.* court expressly distinguishes cases involving, as here, "a total lack of effort on the part of the petitioning agency . . . ." (*In re Melinda J., supra,* 234 Cal.App.3d at p. 1419.) Rather than excusing inactivity, it makes clear that going through the motions, even without an expectation of success, is integral to due process: " '[I]n the case of persons missing or unknown, *employment of an indirect and even a probably futile means of notification is all that the situation permits* and creates no constitutional bar to a final decree foreclosing their rights.' [Citation.]" (*Ibid.*, italics added.)

SSA's argument that under *Melinda J.*, due process requires only " 'notice reasonably calculated' " to alert a party (*In re Melinda J., supra,* 234 Cal.App.3d at p. 1418), is purely academic where *no* notice has been attempted. Likewise inapt is SSA's contention that *Melinda J.* teaches strict compliance with statutory notice is not required in futile situations involving missing persons. Obviously, the inquiry into strict compliance is triggered only when it is necessary to evaluate what *was* done. In *Melinda J.*, SSA made "sincere and extensive efforts to locate" the mother, and "even with the benefit of hindsight," the court found "nothing else that should have been done." (*Id.* at p. 1419.) Here, *nothing* was done. The juvenile court's remarks about mother's lack of diligence in searching for her children, *ante*, are more aptly applied to SSA's lack of diligence in searching for mother. To wit, SSA apparently "never did the obvious": It never asked father about relatives or friends who might know how to contact mother. Nor did SSA

explain why the grandmother, who did have the necessary information, could not have been identified earlier.

Additionally, *Melinda J.*'s discussion of strict compliance with regard to the statute's *procedural time frames* (§ 366.21, subd. (b); *In re Melinda J., supra,* 234 Cal.App.3d at p. 1419) is inapt here, where we are concerned with the statute's *substantive notice requirement.* This same limited context defeats SSA's contention that under *Melinda J.,* mother had to show prejudice. (*In re Melinda J., supra,* 234 Cal.App.3d at p. 1419 ["lack of strict compliance with [the statutory notice time frames], in the absence of prejudice, [did] not render the subsequent proceedings void"].) SSA relies on one other case to support its contention that strict compliance with the notice requirement is not required and the aggrieved party must show prejudice. The case, *In re Genesha S.* (Apr. 14, 1998) E021495, was depublished by our Supreme Court's order dated July 8, 1998.

Taking another tack, SSA asserts mother has waived her right to appeal. It argues that at the six-month review hearing, reunification services were terminated and the matter referred for a permanency hearing. (§ 366.26, subd. (*l*); Cal. Rules of Court, rule 39.1B.) Since the court sent notice to mother's Long Beach address advising her of the need to petition for writ, and she did not respond, she is precluded from obtaining review on appeal. Wrong. Quite apart from the obvious defects in notice which infect the proceedings in their entirety, including notice of the writ petition requirement, we observe mother does not impermissibly seek review of the merits of the orders issued at the referral hearing. The basis of her appeal is the lack of statutorily required notice. This is a proper and sufficient basis for reversal and remand. (See *In re Anna M., supra,* 54 Cal.App.4th 463, *passim.*) Additionally, SSA's cited waiver case, *John F. v. Superior Court* (1996) 43 Cal.App.4th 400 [51 Cal.Rptr.2d 22], is inapt. There, the parents waived any issue regarding the reunification plan established at the dispositional hearing because they did not timely appeal from the appealable dispositional order. (*Id.* at pp. 404-405.)

Our Supreme Court teaches that a dependent minor has a compelling right to a stable and permanent placement in a family unit which will allow the caretaker to make a full emotional commitment to the child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306 [19 Cal.Rptr.2d 544, 851 P.2d 826].) We must evaluate that right in the context of mother's compelling interest as a parent and her due process right to be notified of the proceedings. As recently stated by another panel of this court, "The county has a constitutional responsibility to use due diligence to notify absent parents before depriving them of that 'most basic of civil rights'—the care, custody, and

companionship of their children. [Citation.]" (*County of Orange v. Carl D.* (1999) 76 Cal.App.4th 429, 439 [90 Cal.Rptr.2d 440].) Where SSA fails even to make an effort to provide mother the procedural safeguard of notice, reversal is mandated. In light of this disposition, we need not consider the other issues mother has raised.

*Father's Appeal*

This leaves us with father's contention that if the judgment terminating mother's parental rights is reversed, the judgment terminating *his* parental rights must be reversed as well, despite the absence of independent error pertaining to him. We agree, although we observe this result is not automatic, but dependent upon whether there are impediments to reversal. (See, e.g., *Los Angeles County Dept. of Children & Fam. Services v. Superior Court* (2000) 83 Cal.App.4th 947 [100 Cal.Rptr.2d 172]; *In re Caitlin B.* (2000) 78 Cal.App.4th 1190, 1193-1194 [93 Cal.Rptr.2d 480]; *In re Joshua M.* (1997) 56 Cal.App.4th 801, 807-808 [65 Cal.Rptr.2d 748].)

California Rules of Court, rule 1463(a) provides, in part, "The court may not terminate the rights of only one parent under section 366.26 unless that parent is the only surviving parent, or the rights of the other parent have been terminated . . . or the other parent has relinquished custody of the child to the welfare department." In this case, the rights of both parents *were* terminated in a single proceeding, as is required by rule 1463. However, we are reinstating mother's rights pending further proceedings; thus the stated purpose of "free[ing] the dependent child for adoption" (Cal. Rules of Court, rule 1463(g)) is not now attainable. The children are once again in limbo, and no one knows at this time whether they will be adopted or permanently returned to their mother. That being the case, we perceive no legitimate purpose to be served by leaving them without a father and whatever legal benefits or entitlements that may come to them through the paternal side of the biological family. In short, it is in the minors' best interests to reinstate father's parental rights. We emphasize this does not affect the order terminating father's reunification services.

DISPOSITION

The judgment terminating the rights of both parents and freeing the minors for adoption is reversed. The findings and orders made at the

six-month review hearing and thereafter regarding mother only are reversed. The case is remanded for proceedings conforming to this decision.

Sills, P. J., and Bedsworth, J., concurred.